The HANNA MINING COMPANY,
et al., Plaintiffs,

v.

NORCEN ENERGY RESOURCES
LIMITED, et al., Defendants.

No. C82–959.

United States District Court,
N.D. Ohio, E.D.

June 11, 1982.

Patrick F. McCartan, Richard W. Pogue, John L. Strauch, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Carl E. Nickels, Jr., John Gurgle, Cleveland, Ohio, for The Hanna Mining Co., for plaintiffs.

James A. Smith, James P. Murphy, Frances Floriano Coins, John E. Lynch, Jr., Squire, Sanders & Dempsey, Cleveland, Ohio, Paul C. Saunders, Cravath, Swaine & Moore, New York City, A.J. Knopp, Baker & Hostetler, Cleveland, Ohio, James M. Tobin, Thomas E. Palmer, Squire, Sanders & Dempsey, Columbus, Ohio, for defendants.

## MEMORANDUM OF OPINION

MANOS, District Judge.

On April 5, 1982 plaintiffs, Hanna Mining Company, (hereinafter, Hanna), Carl E. Nickels, Jr., Executive Vice President and a member of Hanna's Board of Directors and John Gurgle, an employee of Hanna and former beneficial owner of seventy (70) shares of Hanna stock, filed the above-captioned case to enjoin a proposed tender offer by the defendant, Norcen Energy Resources Limited, (hereinafter, Norcen), for fifty-one (51) percent of Hanna's issued and outstanding common stock because Norcen and defendants, Conrad M. Black, Chairman of Norcen's Board of Directors and a controlling shareholder, his brother, G. Montegu Black, a member of Norcen's Board of Directors and a controlling shareholder, Edward G. Battle, Norcen's President and Chief Executive Officer and Lehman Brothers Kuhn Loeb Inc., (hereinafter, Lehman Brothers), an investment banker hired by Norcen, committed acts in violation of sections 10(b), 13(d), 14(e) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.

§§ 78j(b), 78m(d), 78n(e) and 78t(a); Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 and OHIO REV.CODE ANN. § 1707.041(B)(2) (Page 1979). On April 12, 1982 the plaintiffs filed an amended complaint adding William T. Kilbourne, Norcen's Vice President of Administration and Secretary, as a defendant and alleging also that the defendants' conduct violated Title IX of the Organized Crime Control Act of 1970, commonly known as the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, (hereinafter, RICO), and the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a. Jurisdiction is invoked under 15 U.S.C. § 78aa [1] and 18 U.S.C. § 1964(c).[2] On April 20, 1982 the claims against Lehman Brothers were dismissed without prejudice by stipulation. The case is currently before this court on the plaintiffs' motion for a preliminary injunction on their federal securities claims.[3] On the motion the parties rely on affidavits, depositions and on facts developed at an evidentiary hearing.

Hanna is a Delaware corporation with its executive offices located in Cleveland, Ohio. It considers itself as a "leading independent natural resources company involved in ferrous and non-ferrous minerals and metals as well as energy resources such as oil, natural gas and coal."[4] It is engaged in substantial iron ore mining activities and is the only integrated nickel producer in the United States.[5] Its business activities and customers are located in the United States, Canada, Latin America, Western Europe and Japan.[6] Its securities are registered under section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78 *l* and are traded on the New York Stock Exchange. As of December 31, 1981 Hanna had 8,945,050 shares of common stock issued and outstanding which were owned by approximately 4,390 shareholders.[7]

Norcen is a Canadian corporation with its executive offices located in Toronto, Ontario. Its primary business is "exploration, development and production of oil and natural gas, principally in Canada and distribution of natural gas in Ontario and Manitoba."[8] "Norcen is one of the larger Canadian owned and controlled companies operating in the oil and gas exploration and pro-

1. 15 U.S.C. § 78aa provides as follows:

   The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found. Judgments and decrees so rendered shall be subject to review as provided in sections 1254, 1291, and 1292 of Title 28. No costs shall be assessed for or against the Commission in any proceeding under this chapter brought by or against it in the Supreme Court or such other courts.

2. 18 U.S.C. § 1964(c) provides as follows:

   Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

3. Ruling on the plaintiffs' racketeering claims is reserved to permit the parties time to conduct adequate discovery. The plaintiffs' antitrust and state securities law claims have been dismissed in a contemporaneous Memorandum of Opinion.

4. The Hanna Mining Company, *Annual Report 1981*, Introduction.

5. *Id.*

6. *Id.*

7. Affidavit of John S. Pyke, Jr., Vice President and Secretary of Hanna Mining Company, pp. 5–6, ¶ 14.

8. Norcen Energy Resources Limited, *Annual Report 1981*, Introduction.

duction operations of Canada."[9] Similar to Hanna, Norcen's securities are registered under section 12 of the Securities Exchange Act of 1934. They are traded on the Toronto and Montreal Stock Exchanges. As of March 31, 1982 Norcen had 26,544,886 shares of common stock issued and outstanding.[10]

Carl E. Nickels, Jr., is Executive Vice President and a member of Hanna's Board of Directors. He has been employed by Hanna since February, 1953 and is a record and beneficial owner of 2,875 shares of Hanna stock.[11] Nickels is a party to this action in his capacity as a Hanna shareholder.

John Gurgle is employed by Hanna as a cash manager. On November 13, 1981 he sold thirty-four (34) shares of Hanna stock. On March 29, 1982 he sold thirty-six (36) additional shares.[12] He remains a beneficial owner of other shares.[13] Gurgle is a party to this action in his capacity as a former and current Hanna Shareholder.

Conrad M. Black is a Canadian citizen. He is Chairman of Norcen's Board of Directors and Executive Committee and is a "controlling person" for the purposes of section 20(a) of the Securities Exchange Act of 1934. 15 U.S.C. § 78t(a). In 1967 Black began his business career by purchasing a rural newspaper that was nearly bankrupt. Within two years he purchased two others. These properties prospered and subsequently Black and his associates owned or controlled "a series of other newspapers—dailies, weeklies and bi-weeklies—in Canada, mainly British Columbia and the West Coast, adding up to a total of about 20 newspapers." Tr., p. 528. During this period, Black, joined by his brother, also invested in a malting company, a securities brokerage firm, "now the largest securities dealer in Canada" and a number of real estate ventures." Tr., pp. 528, 529.

Currently, in addition to his controlling interest in Norcen, Black, directly or indirectly, owns or controls the following companies: (1) 75% of Western Dominion Investment Company Limited; (2) 51% of The Ravelston Corporation Limited; (3) 64% of Argus Corporation Limited, all of which are Canadian investment companies; (4) 49% of Standard Broadcasting Corporation, a Canadian radio and television broadcasting company; (5) 52% of Dominion Stores Limited, a Canadian food merchandising company; (6) 93% of Hollinger Argus Limited, a Canadian mining and investment company; and (7) 67% of Labrador Mining and Exploration Company Limited, a Canadian mining and natural resources exploration company. Tr., pp. 263–267. From 1978 through 1980 Black was a director and Chief Executive Officer of Massey-Ferguson Company, "the only great Canadian manufacturing company." Presently, he is a director on the boards of a large number of corporations, including but not limited to: (1) Canadian Imperial Bank and Commerce; (2) Eaton's of Canada Limited; (3) Confederation Life Insurance Company; and (4) Carling O'Keefe Limited. Tr., pp. 530, 269. Although it is apparent that Black is extremely sophisticated in the realm of internal corporate affairs, the essence of his investment philosophy is quite simple—avoid token investments and token control. Tr., pp. 269, 270.

G. Montegu Black is a Canadian citizen. He is a member of Norcen's Board of Directors and of its Executive Committee. He is also President, Chief Executive Officer and a member of the Executive Committee of Argus Corporation Limited; Chairman of the Boards of Directors and member of the Executive Committees of both Standard Broadcasting Corporation and Dominion Stores Limited; Director, President and member of the Executive

---

9. Deposition of Edward G. Battle, p. 5.

10. Norcen Energy Resources Limited, *Form 10K*, March 31, 1982.

11. Affidavit of John S. Pyke, Jr., *supra*, Attachment E, pp. 3–4.

12. Deposition of John Gurgle, pp. 16–18, 20–22.

13. *Id.*, at p. 6.

Committee of Hollinger Argus Limited; and Director, Executive Vice President and member of the Executive Committee of Labrador Mining and Exploration Company Limited.[14]

Edward G. Battle is a Canadian citizen. He is a petroleum engineer and has been employed by Norcen and its predecessor since 1957. Currently, he is a Director, member of the Executive Committee and Norcen's President and Chief Executive Officer. He is also a Director of Labrador Mining and Exploration Company Limited.[15]

William T. Kilbourne is an American citizen. He is an attorney, admitted to practice in the United States and has been employed by Norcen and its predecessor since 1972. Currently, he is Norcen's Vice President of Administration, Secretary and senior legal officer. He has responsibility for all of Norcen's administrative, legal, human relations and record keeping functions. Tr., pp. 764-768.

The parties to this suit are not strangers to one another. Indeed, they currently maintain the following business relationships: (1) Hanna owns 20% of Labrador Mining and Exploration Company Limited; (2) Hanna, 60% and Hollinger Argus Limited, 40%, are partners in Hollinger North Shore Exploration, Inc., a Canadian mining and energy resources company and equal partners in Hollinger Hanna Limited, a Canadian management company; and (3) Hanna, Hollinger Argus Limited and Labrador Mining and Exploration Company Limited are all shareholders of Iron Ore Company of Canada, an iron ore mining company. Because of these relationships, representatives of Hanna and the Blacks sit on some of the same boards of directors. For example, Robert F. Anderson, a Director and Hanna's President and Chief Executive Officer, Brian Mulroney, a member of Hanna's Board of Directors and President of Iron Ore Company of Canada and Nickels, along with the Blacks and Battle, are Directors of Labrador Mining and Exploration Company Limited.

Another relationship important to this suit is between Hanna and the "Humphrey family." Until his death in June, 1979, Gilbert W. "Bud" Humphrey, Sr., was Hanna's President and Chief Executive Officer. He was also a substantial shareholder. His widow, Louise Humphrey, remains a substantial shareholder, having acquired shares not only from her late husband but also from her father. Her brother, R.L. Ireland, III, a member of Hanna's Board of Directors, is also a substantial shareholder as are her two sons, George M. Humphrey, II, a Director and Hanna's Senior Vice President of Sales and Gilbert W. Humphrey, Jr., Vice President of Marketing and Sales of National Steel Corporation.

Conrad Black first expressed an interest in investing in Hanna during a conversation with Gilbert W. "Bud" Humphrey, Sr., in January, 1979. Black testified that he informed Humphrey "that when we [the Blacks] got our corporate house in order and finished the restructuring of our group, it was certainly my ambition and that of my associates to have a little more presence in the United States." Tr., p. 563. Soon thereafter, Humphrey died. Undeterred, Black pursued his investment "ambition" in 1980 during a series of conversations that he initiated with George M. Humphrey, II.

On June 27, 1980 the first of these conversations occurred when Black appeared at Humphrey's office at Hanna headquarters. On that date Humphrey was Hanna's Vice President of Sales but not a member of its board of directors. Regarding the nature of the conversation, Humphrey testified that "[w]hat I recall was [Black] coming into my office and saying that he had noticed that it appeared to him that both me as an individual and my family had been shunted out of the mainstream as far as the management of the Hanna Mining Company was concerned, and he wondered how I felt about that." Tr., p. 1111. Hum-

---

**14.** Deposition of G. Montegu Black, pp. 4, 6.

**15.** Deposition of Edward G. Battle, pp. 6, 7.

phrey responded that he (Humphrey) "did have a deep concern about where my position was in Hanna and where Hanna was going." Tr., p. 1132. Black expressed confidence in Hanna's management, inquired about the extent of the Humphrey family's stock holdings in Hanna and indicated a desire to discuss "some ideas" with Humphrey at some future date. The meeting ended when Humphrey informed Black that he (Humphrey) "would be available to have such discussion." *Id.*

In August, 1980 Black solicited a second meeting with Humphrey which was held at Humphrey's home in Gates Mills, Ohio. At this meeting Black indicated that he had an interest in Hanna as a "vehicle" for expanding his interests in the United States because "he wanted to diversify the geographical basis of his assets ... [and] bring money into the United States." Tr., p. 1140. Humphrey testified that Black also "said that Hanna Mining looked to be an interesting vehicle ... [because] we had been partners or our predecessors had been partners over a long period of time." *Id.* Humphrey further testified that Black seemed "enamored" with the prestige "that the Hanna name represented and he mentioned specifically the value of our contacts with Bechtel and the Mellon family." *Id.* During the course of this discussion Black also referred to the potential effects his proposed investment would have on the Iron Ore Company of Canada. Humphrey testified that "Conrad ... seemed to have a scheme that he could use the earnings of the Iron Ore Company of Canada to better advantage than the owners themselves ... because he could somehow shelter them in drilling out in Western Canada for oil and gas." Tr., p. 1116. According to Humphrey, Black also noted that his proposed investment would enhance his image in Canada because "he could, in effect, be seen as repatriating ... some of Iron Ore of Canada's shares." *Id.*

After Humphrey was apprised of the reasons for Black's proposed investment in Hanna, Black mentioned the possibility of a voting trust or some other form of alliance between his investment and the Humphrey family's interests. Humphrey testified that Black also indicated "that if I or any member of my family had any shares that we wanted to sell, dispose of, he would be a buyer." Tr., p. 1115. Humphrey did not respond to any of Black's proposals. Regarding his lack of response, Humphrey testified that ... "[n]one was called for." *Id.* "He [Black] was not saying anything but the kindest words about management and about the company." *Id.* The meeting terminated without any specific proposals. According to Humphrey, it had been "a very broad-gauged discussion, very little in the way of specifics," with Black emphasizing "that any ... involvement would only be ... on a friendly basis ...." Tr., pp. 1113, 1115.

On May 7, 1981 Black and his brother solicited a private meeting with Humphrey following the annual meeting of Labrador Mining and Exploration Company Limited, which Humphrey attended in his capacity as a Hanna officer. During this meeting, Conrad Black again raised the possibility of an investment in Hanna and "again advised right up front that he would only seek involvement with Hanna Mining Company on an entirely friendly basis." Tr., p. 1118. As in their earlier meeting, "[h]e was very complimentary to Hanna Mining Company's management." *Id.* Similarly, the meeting ended without any specific proposals.

On August 15, 1981 Conrad Black telephoned Humphrey at his vacation home in Maine. At that time Humphrey had become a member of Hanna's Board of Directors. Black testified "... I told him that we were contemplating now in [sic] a somewhat imminent basis the thought of buying some Hanna shares, and reemphasized that our wishes were entirely friendly, both to the management of the company and to his family...." Tr., pp. 574, 575. Humphrey recalled that Black "started out by saying his interest in Hanna was keener than ever and he was ready to do something." Tr., pp. 1119, 1120. Humphrey testified that "[d]uring the course of the conversation he [Black] said once again

what he had said to me back in August of 1980, namely, that he would be willing to buy shares if my family had any they would be willing to sell." Tr., p. 1120. Although Humphrey informed Black, "[l]ook, let me have some time to think over what you are saying and I will get back to you as soon as I can," Tr., p. 1122, he (Humphrey) expressed unequivocal loyalty to Hanna management and to the company. Thereafter, Humphrey discussed the matter with his uncle, R.L. Ireland, III. On August 17, 1981 Humphrey telephoned Black and informed him of his (Humphrey's) position. Humphrey testified, "I reiterated I was now thoroughly satisfied with my position in the Hanna Mining Company and with the direction of top management ... that I was therefore a completely loyal member of the management and the Hanna Board of Directors and, if he wanted to do anything whatsoever on a friendly basis with Hanna Mining, he should deal with Bob Anderson and leave me completely out of it and I didn't want anything more to do with it." Tr., p. 1124.

On August 18, 1981 Norcen began making open market purchases of Hanna stock. Battle testified that the short run purpose of these purchases was to acquire 4.9% of Hanna's stock and that the ultimate purpose was to acquire 51% at a later date.[16] On August 21, 1981 Battle authorized the Canadian Imperial Bank of Commerce to establish a 20 million dollar line of credit to enable Norcen to purchase 4.9% of Hanna's stock. The account was exclusive of normal operating lines of credit extended to Norcen by the bank, maintained confidentially, (neither bank statements nor debit advices were delivered to Norcen's offices) and was assigned a secret account number. Tr., pp. 325, 326. By September 9, 1981 Norcen had made eighteen (18) open market purchases of Hanna stock at prices ranging from $34.50 to $36.00 per share for a total of 58,000 shares.

On September 9, 1981 the Executive Committee of Norcen's Board of Directors met and discussed the Hanna stock acquisition program.[17] The formal minutes of that meeting contain in pertinent part:

*U.S. Acquisition* —Mr. Battle stated that the Company, subsequent to telephone contact with the members of the Executive Committee, had initiated through stock market transactions the acquisition of a 4.9% stock interest in a U.S. company listed on the New York Stock Exchange *with the ultimate purpose of acquiring a 51% position at a later date.* This strategy would achieve an important entry into the U.S. market and simultaneously broaden the Company's operations and geographic locations. He then described the asset, book and market values of the target company and briefly summarized its current operations and the impact on Norcen's structure and Canadian operations if the stock purchase program is successful. *A discussion of the proposed acquisition then followed. The Executive Committee ratified the prior stock purchases and supported the proposed U.S. stock acquisition program.*

(Emphasis added). The "U.S. company" described in the minutes is Hanna. Tr., p. 786. When Battle was asked, "[s]o that to the best of your knowledge and recollection, at the meeting of September 9, 1981 there was a discussion and support by the executive committee for a program which would permit Norcen to eventually acquire a 51 percent position at a later date in Hanna, but there was no specific discussion of by what point in time you would achieve that position or the means and methods that you would use to achieve a 51 percent position in Hanna?", he responded, "[t]hat would be my recollection, yes." [18] Battle's answer was corroborated by Black's testimony. Tr., pp. 305, 306, 309.

---

16. *Id.*, at p. 48.

17. Norcen's Executive Committee exercises all powers of the Board of Directors except those prohibited by statute. Tr., p. 769. Specifically, the Executive Committee had the power to ap-

prove the acquisition of Hanna stock. Tr., pp. 296, 297, 842, 843.

18. Deposition of Edward G. Battle, pp. 58, 59.

Between September 9, 1981 and October 27, 1981 Norcen continued making open market purchases of Hanna stock so that by the latter date Norcen owned between 200,000 and 205,000 shares.[19] On October 28, 1981 Black was offered and Norcen purchased, a block of 580,000 shares of Hanna at $37.00 per share for a total of $21,460,000. This purchase raised the total Norcen holdings of the outstanding Hanna stock to 8.8%. Although it is unquestioned that the purchase brought Norcen's holdings above 4.9%, increased its net carrying cost of the investment to over 2.5 million dollars per year (assuming a purchase of 800,000 shares and subtracting Hanna's dividend of $2.00 per share from the debt service cost of $3.40 per share, Tr., p. 329) and required an increase in Norcen's credit line from the Canadian Imperial Bank of Commerce, Black neither obtained authorization from Norcen's Board of Directors nor its Executive Committee to make the purchase and the Executive Committee did not ratify the purchase after it was made. Tr., p. 814. The manner in which Black made the purchase *establishes conclusively* the extent of his personal control over Norcen's internal affairs. When Battle was questioned regarding the relationship of the purchase to the stock acquisition program previously approved by Norcen's Executive Committee, Battle responded that the purchase "was made as per the resolution at the executive committee meeting of September 9." [20]

Following the purchase Black telephoned Anderson, who was out of the country. He then spoke to Nickels and informed him of Norcen's stock purchases. Nickels testified that Black "wanted to immediately assure me that the stock was acquired by him, or by his company, Norcen, for investment purposes only, and that they had no ulterior motive whatsoever in making this purchase, and he was particularly keen ... that I call Mr. Robert Anderson and make sure Mr. Anderson understood that this was the case, because he was very con-

cerned about what Mr. Anderson's attitude might be." Tr., pp. 37, 38. When asked whether he believed Black's statement that Norcen had acquired the stock for investment only and with no ulterior motive, Nickels responded, "[y]es I did, because he [Black] went on to elaborate that he didn't want to upset anyone by this investment ... [and] that if Hanna's management or Hanna's Board was upset with this and if they were going to go public with that feeling, he would find a way to back away...." Tr., p. 39.

On November 3, 1981 Hanna's Board of Directors convened to consider Norcen's purchases of Hanna stock. Nickels testified that the directors "... took the position that [Black] was not someone that would be welcome into the Hanna Mining Company; that we could see a serious problem by having him as an investor, and that we should arrange for a meeting with Mr. Black and convey to him the unanimous view of the Board that [it was] against his investment and that [it] wanted him out." Tr., p. 46.

On November 4, 1981 Black and Battle met with Anderson and Nickels at the Sheraton Hopkins Hotel in Cleveland. At the outset of the meeting Black reaffirmed his earlier statement to Nickels that Norcen had purchased Hanna stock for investment purposes only. Tr., p. 49. Anderson and Nickels informed Black of Hanna's opposition to Norcen's purchases. Black testified that they also "expressed concern [over how Norcen's purchases would affect] the relationship that they had with some joint venture partners...." Tr., p. 610. When Black was apprised of Hanna's opposition to Norcen's purchases he proposed a stock "swap." Nickels testified that "[a]t one point during the meeting when the position of our Board was made completely clear to Mr. Black, he threw out some ideas, one of which was perhaps, and as he expressed it at that time, without any prior thought, perhaps Hanna might be interested in looking at a swap of Labrador Mining shares,

---

**19.** *Id.,* at pp. 76, 77.

**20.** *Id.,* at pp. 132, 133.

where we hold a 20 percent position, in exchange for the shares they had acquired in the Hanna Mining Company." Tr., p. 54. Anderson reacted negatively to this proposal and the meeting concluded when Black stated that he would "have to review his investment in light of these discussions...." Tr., p. 55.

Norcen's purchase of 580,000 shares of Hanna had an unquestioned impact on the market. On October 28, 1981, the date of the purchase, the price of Hanna stock rose $3.25 per share. From October 29, 1981 until November 9, 1981 Hanna stock traded between $35.50 and $39.25 per share at a volume averaging 110,000 shares per day, which was well above the normal volume.[21]

On November 6, 1981 Norcen announced its purchases of Hanna stock in the following press release:

### NORCEN PURCHASES INVESTMENT POSITION IN THE HANNA MINING COMPANY

Norcen Energy Resources Limited *purchased for investment* 783,700 shares or approximately 8.8% of the outstanding common stock of The Hanna Mining Company through market purchases on the New York Stock Exchange. Norcen intends to review its investment position from time to time. Depending on such review, market and business conditions and other factors, Norcen may seek to acquire further shares of common stock or may sell shares of common stock.

(Emphasis added). On November 9, 1981 Norcen filed a Schedule 13D pursuant to 15 U.S.C. § 78m(d), with the Securities and Exchange Commission, (hereinafter, SEC), regarding its purchases of Hanna stock. Item 4 of the Schedule, entitled "Purpose of the Transaction" provides as follows:

Norcen's purpose in purchasing the shares of Common Stock was to acquire *an investment position in Hanna.* Norcen intends to review its investment position from time to time. Depending

on such review, market and business conditions and other factors, Norcen may seek to acquire further shares of Common Stock or may sell shares of Common Stock.

(Emphasis added). Before filing, the Schedule was approved by Black, Battle and Kilbourne. Although the Schedule does not refer to the September 9, 1981 "resolution" of Norcen's Executive Committee regarding acquisition of "a 51 percent position" in Hanna, when Battle was asked, "[n]ow at the time you signed [the Schedule] ... neither the executive committee of Norcen nor its board of directors had taken any action to revise the program with respect to the acquisition of a 51 percent interest in Hanna at a later date ... had they?", he responded, "[n]o." [22]

As Norcen's senior legal officer Kilbourne was responsible for drafting and filing the Schedule 13D. Prior to November 9, 1981 he, with the aid of Norcen's United States counsel, prepared several drafts. Comparing these with the Schedule that was filed reflects the removal of specific disclaimers by Norcen regarding any present "plan" or "intention" to acquire a "significant" investment position in Hanna, "to increase its investment on Hanna," "to seek representation on Hanna's Board of Directors" and/or "to seek control of Hanna." Black testified that on advice of Norcen's United States counsel that "... [the 'Purpose of the Transaction'] section should reveal exactly what plans and purposes we had but that it should not reveal anything other than that ...", the section was written to be "as short and antiseptic as possible." Tr., pp. 337, 338, 624.

Following the filing of Norcen's Schedule 13D with the SEC, the market price of Hanna stock began to decline from a closing price of $34.00 per share on November 9, 1981 to a closing price of $26.00 per

---

**21.** Affidavit of Gene Tiger Sykes, a financial analyst in the Mergers and Acquisitions Department of Goldman, Sachs & Co.

**22.** Deposition of Edward G. Battle, pp. 126, 127.

share on March 30, 1982.[23] During this period, had Norcen announced an intent or purpose to gain control of Hanna, it is undisputed that Hanna stock would have traded at a higher price. Perry J. Lewis, the plaintiffs' expert witness, testified, "... I think that that type of announcement would have set in motion a series of events that would bring in—first, it would bring in arbitrage activity, and the market would anticipate that there could be other bidders for this, and the market would anticipate that the company, Hanna itself, would take a position as to whether this was desirable or how they regarded this, and I think generally the effect would have been strongly positive on the market." Tr., pp. 423, 424. Similarly, Eric J. Gleacher, the defendants' expert witness, testified , "I think that the bottom line of my opinion is that the price of Hanna stock at the end of March, 1982 would have been $1.00 or $2.00 higher than it would be under normal market factors." Tr., p. 1047. Had Norcen announced an intent to acquire " 'a significant portion of Hanna's stock' ... [defined as] 20 to 30 percent," Lewis testified that, "[i]n my opinion an announcement of an intention to acquire 20 to 30 percent, or a significant portion, would not be interpreted differently than if they stated they were going to seek control, because I think the market assumes that 20 or 30 percent, a 20 or 30 percent interest, or a "significant portion" of a company like Hanna does constitute control unless there is known to be an even larger block which would serve to balance this out," and Gleacher testified that, "[m]y opinion is that the stock would have jumped up at the beginning of that period almost identically to what it would have under the prior assumptions, the main reason in this case being that the market would have assumed Hanna would have gone out and tried to find a White knight so they would not end up in a position where Norcen would have a minority interest like that." Tr., pp. 428, 429, 1051.

Shortly after November 9, 1981 Kilbourne determined that certain legal research should be undertaken regarding Norcen's purchases of Hanna stock. Although the research conducted pertained to many aspects of Norcen's stock purchases, including a subsequent sale, when Kilbourne was asked whether "... the research that you requested ... [United States counsel] to perform at that time was research concerning State and Federal law applicable to the acquisition of a controlling interest in the Hanna Mining Company ...", he responded in the affirmative. Tr., p. 905. Indeed, in a November, 1981 response to Kilbourne's request, Norcen's United States counsel produced a memorandum, the introduction to which provides in pertinent part as follows:

> This memorandum reviews certain Federal and state laws which may apply to the acquisition by a foreign corporation ("the Purchaser") of a controlling interest in a Delaware corporation ("the Company"). The acquisition may be made by open market and privately negotiated stock purchases for cash, or by a cash tender offer, or by such purchases followed by a cash tender offer. The Company is a Delaware corporation with offices in Ohio.

Kilbourne identified "the Purchaser" as Norcen and "the Company" as Hanna. At the time the memorandum was prepared Kilbourne knew that contact had been made with the Humphrey family and that Norcen was considering the possibility of acquiring its Hanna stock.

In late November, 1981 Kilbourne received two other memoranda from Norcen's United States counsel. The first, dated November 23, 1981, and entitled "Ownership of Stock in Natural Resources Company," identifies Hanna shareholders who owned 1,000 shares or more as revealed by Hanna's proxy and other SEC filings of record. With respect to the holdings of R.L. Ireland, III, the memorandum provides that, "[i]n light of ... the fact that he is the uncle of G.M. Humphrey, II ... [he]

---

**23.** Affidavit of Gene Tiger Sykes, *supra*.

would be worth contacting as to the possibility of acquiring a block of over 100,000 shares of [Hanna] stock." The second memoranda, dated November 29, 1981, was a preliminary timetable for a tender offer. By December 16, 1981 draft materials for a filing under the Hart-Scott-Rodino Antitrust Improvement Act, 15 U.S.C. § 18a, had also been prepared.

In mid-December, 1981 Norcen representatives began contacting investment bankers. Those eventually contacted included the following nationally prominent firms: (1) The First Boston Corporation; (2) Morgan Stanley and Co., Incorporated; (3) Smith Barney, Harris Upham & Co., Incorporated; (4) Solomon Brothers; (5) Blythe Eastman Paine Webber Incorporated and (6) Lehman Brothers. Some of these firms were not hired by Norcen because of conflicting representations but, at least two of the firms, The First Boston Corporation and Morgan Stanley and Co., Incorporated, declined to represent Norcen because they would not participate in a hostile tender offer. Tr., pp. 942, 943.

In late November, 1981 Black telephoned Louise Humphrey at her vacation home in Florida. Black testified that, "I said to her that we had bought some shares in Hanna, that we were very interested in knowing whether the Humphrey family as a group considered itself to be continuing shareholders on such a scale, to be, as they had been perceived in the past, proprietors of the company or whether they were as a group intending to withdraw as shareholders; that we were entirely supportive of management; that we wanted to avoid anything that would be thought antagonistic toward management or to her family and that we had been very strenuously advised by the management that if we bought any more shares, they would consider that to be unfriendly and that we had undertaken not to buy any more shares without speaking to them and that we were just quite passive with our shareholding, we were immobilized with it and we were wondering what to do with it ... in the context of making the review of the shareholdings, that we had mentioned in our filing with

the Securities and Exchange Commission; that I was curious as to what her family might do with their shares or what their attitude to the company was." Tr., pp. 629, 630. Black testified that he also "... went to very great length to explain that I was not, I could not be construed as being conspiratorially minded here and I asked if she saw any impropriety in my presenting that question." Tr., p. 630. Humphrey responded by informing Black that her son, Gilbert W. Humphrey, Jr., was the "principal fiscal advisor to her and her family" and that she would ask him to return Black's telephone call. *Id.* On the following day Humphrey complied with his mother's request and telephoned Black. Humphrey testified that "[Black] indicated that he was interested in discussing with me the Hanna Company and the future interests of the Humphrey family in relationship [sic] to the Hanna Company." Tr., p. 180. Black testified that he "... recapitulated pretty much what ... I had said to his mother the day before, that we were reviewing this investment, we had no plans at all with it, we were somewhat flabbergasted at the militancy of Mr. Anderson's request that we not buy any more shares but we had undertaken not to buy any more shares and we were reviewing the investment; we had been urged to sell our shares, we were reluctant to do that, but we were completely uncertain as to what we were going to do; and we were very supportive of management, we were very respective [sic] of the Humphreys as the traditional principal element of ownership along with their relatives in ownership of the company, we didn't want to rock the boat and we just sincerely didn't know what to do, and on that basis did he, I asked ... see any utility in our meeting." Tr., pp. 631, 632. Humphrey responded that he did and he and Black agreed to determine a date that would be mutually convenient.

On December 21, 1981, Black, his brother and Battle met with Humphrey at his home in Pittsburgh, Pennsylvania. Humphrey identified the members of the Humphrey

family for whom he was authorized to speak but declined to divulge any specific information about the size of their holdings in Hanna. Conrad Black reemphasized his desire not to create an unfriendly situation with Hanna and related Hanna management's negative attitude toward Norcen's stock purchases. In hypothetical terms, various possibilities were discussed through which the Norcen and Humphrey family's stockholdings could be combined so as to achieve control of Hanna. Included among these was a Norcen-Humphrey tender offer for 51% of Hanna's outstanding shares. The meeting ended without any "commitments to do anything." Tr., p. 638. Humphrey told Black that he would consult "such members [of his family] as he judged appropriate and with Paul Mellon, a significant Hanna shareholder. Humphrey also requested some information regarding Norcen, including annual reports and Form 10Ks because he "wanted to understand more about the Blacks and their investment philosophies." Tr., p. 232.

Following the December 21, 1981 meeting with Humphrey, Norcen's United States counsel prepared two draft tender offers for Hanna stock. Dated January 8 and January 15, 1982, both drafts contemplated a tender offer by Norcen for an unspecified amount of Hanna stock and a "Stock Purchase Agreement" under which members of the Humphrey family, described as the "Z family," would purchase an unspecified amount of stock tendered under the terms of the tender offer. Battle had directed Kilbourne to have these documents prepared.[24] Gilbert W. Humphrey, Jr., was not advised that such drafts had been prepared, Tr. pp. 244, 245, 826, 827, and, although Black testified that "extensive preparations for tender offer[s] of major public companies don't take place around [Norcen] without [his] knowing [of it]",[25] he claimed to be unaware of their preparation. Tr., pp. 355, 356.

On February 5, 1982 a second and final meeting with Gilbert W. Humphrey, Jr.,

took place in Pittsburgh, at which Battle and G. Montegu Black represented Norcen. Although Conrad Black did not attend, Battle and G. Montegu Black had spoken to him that morning by telephone and "he was aware of what exactly was transpiring or about to transpire...." Tr., p. 199. Soon after the meeting began Battle informed Humphrey that Norcen was interested in making a tender offer for Hanna and that it (Norcen) was "ready to go" and "set to go" regardless of Humphrey's reaction or opposition from Hanna's management. Tr., p. 204. Humphrey testified that he "... regarded Mr. Battle to be quite anxious." *Id.* Battle also informed Humphrey that Norcen was willing to accept the Humphrey family's participation in the tender offer by giving them an option to purchase a percentage of the stock acquired under the offer. Once again, the meeting ended with no firm commitments.

On February 8, 1982 Gilbert W. Humphrey, Jr., after consulting with his brother George, telephoned G. Montegu Black and informed him that the Humphrey family was not interested in participating with Norcen in its proposed tender offer. Humphrey testified that he made this decision for the following four reasons: (1) "... we did not understand in any way, shape or form how this [tender offer] could be beneficial to [Hanna] shareholders,"; (2) "... we felt that Hanna had a series of programs going that were addressing several of their problems and that the worst thing that could happen to the company at this point in time, given the overall economy and problems facing all of us in any industry and especially our industry, would be to have to spend time away from the programs they were trying to implement to solve their problems fighting a tender offer,"; (3) "... I still did not understand and therefore felt there must be a gap between the philosophies of the Humphreys as investors—the Humphreys being me and those I could speak for—and the Blacks, that being Conrad and Montegu, in

---

**24.** Deposition of Edward G. Battle, p. 164.

**25.** Deposition of Conrad M. Black, p. 277.

terms of how they invested,"; and (4) "... we—me—did not want at any point in time, and especially at this point in time, to be in opposition to the existing [Hanna] management." Tr. pp. 209, 210.

On February 16, 1982 a meeting attended by Anderson, Nickels, George M. Humphrey, II, the Blacks and Battle was held in Toronto. At this meeting Anderson disclosed that he had been recently apprised of the meetings with Gilbert W. Humphrey, Jr., and that he (Anderson) knew "... that the reason these discussions took place was because of Norcen's desire to acquire additional shares in Hanna and, in fact, to acquire control of Hanna." Tr., p. 60. When so informed, Conrad Black responded "that Norcen would be interested in acquiring a 20 percent interest in Hanna so it could equity account for the earnings of Hanna Mining Company." [26] Tr., pp. 60, 61. According to Humphrey, Black, "... went to what seemed to me to be rather extreme lengths to say how superb he thought the management of the Hanna Mining Company was and how much he would enjoy working with them." Tr., p. 1127. Humphrey testified further:

> ... what [Black] was basically saying is, "why don't you people welcome me as a shareholder? I could be the greatest friend you ever had. All I want is to be an investor with you. I am not seeking to manage the company."

*Id.* Nickels testified that he, Anderson and Humphrey, informed Black "... that our position, the company's position, had not changed one bit with respect to [Norcen's] investment, and that the [Hanna] Board had continued to be opposed to it, and that we were still looking for him to dispose of his interest...". Tr., pp. 64, 65. The "stock swap" idea, originally proposed by Black on November 4, 1981, was also mentioned. Anderson informed Black that Hanna was now willing to consider such a "swap" but Battle was critical of the proposal. Battle testified that, "[o]ur reaction, and mine in particular, was that [the stock swap proposal] did not do too much, if anything, for the Norcen shareholder body as a whole, and that was when I suggested that perhaps Hanna should give some consideration to Norcen increasing its interest in Hanna up to between 20 and 30 percent with proportional board representation, and that we would be prepared to consider entering into a standstill agreement." [27] Nickels' contemporaneous notes regarding this discussion, however, indicate that "Conrad agreed to give the swap further consideration and get back to us." Soon thereafter, the meeting was terminated.

Norcen's 1981 Annual Report, dated February 16, 1982, the same date as the Toronto meeting, provides in pertinent part as follows:

> Investment
>
> In the fall of 1981, Norcen acquired 783,700 shares, or approximately 8.8% of the outstanding common stock of The Hanna Mining Company through open market purchases. This investment will be reviewed from time to time. Depending on market and business conditions and other factors, Norcen may seek to acquire further shares of the company or dispose of its present holdings.

Norcen Energy Resources Limited, *Annual Report 1981*, p. 3. Both Lewis and Gleacher testified that had Norcen announced in its annual report an intent or purpose to gain control of Hanna, Hanna stock would have traded at a higher price. Tr., pp. 425, 426, 1050, 1051.

---

**26.** Nickels defined the term "equity accounting" as follows: "... under the prescribed accounting rules, both in the United States and Canada, where you have a certain minority interest in a company, and in this case 20 percent, a 20 percent interest, and also have directors report that go along to represent that interest, the accounting rules allow you to account for a permanent share of that company's earnings directly into your own profit and loss statement, and in this case Norcen, the investor in it, would step up its interest to 20 percent, and would be able to take 20 percent of Hanna's profits after an adjustment for taxes into its earnings account on its own profit and loss statement." Tr., pp. 61, 62.

**27.** Deposition of Edward G. Battle, p. 188.

On March 3, 1982, at a special meeting, Hanna's Board of Directors authorized Anderson and Nickels to make a specific proposal to Norcen regarding a "swap" of Norcen's Hanna shares for Hanna's shares in Labrador Mining and Exploration Company Limited. Accordingly, on March 12, 1982 they met with Black and Battle in Palm Beach, Florida and proposed the following "swap": (1) "Norcen purchases Hanna's 800,000 shares of Labrador"; (2) "Price of $81.00 per share Canadian-1980 Reorganization Plan evaluation (equivalent to $67.00 per share U.S.)"; (3) "$53.6 million U.S. purchase price payable by Norcen's transfer to Hanna of its [Norcen's] 783,700 shares of Hanna stock at a credited value of $28.6 million U.S. (Norcen's cost basis of $36.51 U.S. per share) with balance of $25.0 million U.S. payable to Hanna in cash"; and (4) "Norcen et al [sic] to sign a ten-year standstill agreement, effective following the swap." [28] The "swap" proposal met with a mixed response. Anderson recalled that "Ed Battle said that as far as he was concerned he was not interested in the Labrador Mining stock [and] that he was still very much interested in Hanna as an investment ...", and that "Conrad did not necessarily agree with that, but he felt that there may be someway [in which] the swap of Labrador stock might fit into some of their other plans." [29] Nickels' testimony confirms that "... Battle pretty much disdained the proposal, and that he said this was not of interest to him," while, "[o]n the other hand ... Black did indicate some interest ...". Tr., pp. 72, 73. Nickels testified further that "[b]oth Mr. Battle and Mr. Black never deviated from the stated purpose of making the investment for investment purposes," and that the meeting concluded after "... Black indicated that he would take [the stock swap proposal] under consideration and ... be back to us in a week." Tr., pp. 78, 79.

On March 22, 1982 Norcen representatives met with representatives of Lehman Brothers. Kilbourne testified that "...

they [Lehman Brothers] made their recommendation [regarding Norcen's purchases of Hanna stock] on four scenarios,": (1) "[t]he first ... was a 30 percent public offer,"; (2) "[t]he second ... was a 30 percent purchase of treasury shares to the maximum extent allowed by law"; (3) "[t]he third ... was a 51 percent tender offer and [4] the fourth ... was a 100 percent tender offer." Tr., p. 836. Within this context, Lehman Brothers concluded that Norcen's most appropriate action was to make a tender offer for fifty-one (51) percent of Hanna's issued and outstanding stock at a price of $45.00 per share. This conclusion was reached notwithstanding Norcen's valuation of Hanna stock at $74.00 per share, Tr., p. 1036, Lehman Brothers' "conservative" valuation of Hanna stock at "somewhere in the 50's," Tr., p. 1037, and characterization of Hanna as a "high quality company." Tr., pp. 1061, 1105.

On March 29, 1982 Norcen's Board of Directors convened to discuss Norcen's purchases of Hanna stock. Kilbourne's handwritten notes of the events which took place at the meeting are as follows:

Hanna, EGB[attle] A, Background 2/16/82, Toronto.

B, swap proposal of H[anna] March 12, 1982.

C, H[anna] buy Norcen shares.

D, 3/12/82, Florida.

H[anna] Board authorized to pursue swap by R[obert] A[nderson].

N[orcen] indicated interest in increasing holdings in Hanna.

E, Lehman [Bros., Kuhn, Loeb] 3/22/82, recommendation.

51 percent tender offer preliminary. White knight not likely.

Likely success.

EGB[attle] willing to seek 30 percent and standstill if possible.

W 3/24/ Florida. C[onrad] B[lack] M[ontegu] B[lack] EGB[attle] and mgmt—Review Schedule

---

28. Plaintiffs' Exhibit 4, Attachment A.

29. Deposition of Robert F. Anderson, p. 63.

A, April 2nd, 1982, Cleveland meeting.

B, board approval.

C, tender offer, 51 percent auth[orized], April 5, 1982.

· D, would consider 30 percent public or private, equal board representation [marginal note, Norcen preferred route.]

E, further strategy, week, New York City, April 1, 1982.

F, push button, April 2, 1982 by Executive Committee, call off if standstill agreement achieved.

C[onrad] B[lack], March 12, 1982.

A swap appealing to H[ollinger]-A[rgus], and L[abrador] M[ining] and E[xploration]

B, [ditto marks referring to the word above 'swap'] not appealing to Norcen. Dilution of Norcen net income.

C, H[humphrey family] relationship and Norcen. H[anna] management and Norcen [marginal note C[onrad] B[lack] hope for balance.]

Lehman persuaded to believe we would take less than 51 percent control, i.e. our preference of all possibilities.

Scenario, standstill less than 10 percent, L[ehman,] therefore bid. C[onrad] B[lack], standstill greater than 10 percent and therefore worth try with R[obert] A[nderson].

Also C[onrad] B[lack] concerned for U.S. economy, L[abrador] M[ining &] E[xploration] debt ($368 million)

Interruption of IOC c[ash] F[low] to L[abrador] M[ining &] E[xploration] c[ash] f[low] to L[abrador] M[ining &] E[xploration] c[ash] f[low] for royalty noted.

*We are in a strong position—F[oreign] I[nvestment] R[eview] A[gency]—etc.—existing investment.*

NCN [Norcen] putting money out of Canada to bring back Canadian control of Canadian assets.

Tr., pp. 830–834.[30] (emphasis added). When Kilbourne was asked, "[n]ow, it's true, is it not, that Mr. Conrad Black indicated that [the March 29, 1982 directors meeting] that he thought the existing investment which Norcen had in Hanna put Norcen in a stronger position vis-a-vis other potential suitors for [Hanna' and would make it more difficult for Hanna to resist any of the possibilities you had in mind?", he responded, "Mr. Black considered [the] existing investment as an advantage, yes, sir." Tr., p. 972. Indeed, Kilbourne also responded in the affirmative when asked whether ". . . Norcen still enjoys that advantage today . . . by reason of its 8.8 percent [interest] in Hanna Mining Company?" Tr., p. 973.

On March 31, 1982 Norcen filed its Form 10K with the SEC. In pertinent part it provides as follows:

> In 1981 Norcen acquired an 8.8% interest in The Hanna Mining Company for $34.6 million. . . . The investment in The Hanna Mining Company will be reviewed from time to time. Depending on market and business conditions and other factors, Norcen may seek to acquire further shares of The Hanna Mining Company or to dispose of the present holdings.

Norcen Energy Resources Limited, *Form 10K*, p. 26, March 31, 1982. As with its annual report, had Norcen announced in its Form 10K an intent or purpose to gain control of Hanna, Hanna stock would have traded at a higher price. Tr., pp. 427, 428, 1050, 1051.

On April 2, 1982 Norcen's Executive Committee met at 9:00 a.m., during which Battle reviewed Norcen's efforts to negotiate with Hanna's management and reported that such efforts failed. The Executive Committee authorized Norcen to make a tender offer for 3,800,000 shares of Hanna stock so that, if successful, Norcen would own approximately fifty-one (51) percent of Hanna. The tender offer price was to be determined at a subsequent meeting. The Executive Committee also instructed Battle and G. Montegu Black to inform Anderson of Norcen's decision to make a tender offer. Accordingly, late that afternoon, Battle and G. Montegu Black met with Ander-

---

**30.** Plaintiffs' Exhibit 84, Defendants' Exhibit S.

son and Nickels in Cleveland, Ohio. At the start of the meeting Battle announced: "I am here today to tell you, number one, that on Monday morning [April 5, 1982] the Board of Directors of Norcen has authorized me to go for a tender offer for 51 percent of Hanna Mining stock." Tr., p. 83. As an alternative, he proposed a "standsill agreement." Tr., pp. 84, 85. That agreement provided: (1) Norcen would acquire thirty (30) percent of Hanna by combining a direct purchase of 1,600,000 shares from Hanna with open market purchases; (2) Norcen would not purchase any additional shares until after December 31, 1985; (3) Hanna's Board of Directors would be increased from thirteen (13) to eighteen (18) members with Norcen electing five (5); (4) an eighty (80) percent vote of Hanna's enlarged Board of Directors would be required for spending the proceeds from Norcen's direct purchase of Hanna stock, for any amendment to Hanna's certificate of incorporation or by-laws, for the issue of any shares of common stock at a price less than the current market price and for the approval of any merger or consolidation with or, tender offer for, any shares of common stock by any person or, any sale of a material portion of Hanna's assets in any single transaction or group of transactions, (thereby giving Norcen and Conrad Black a veto power over many significant actions of Hanna's management); and (5) Norcen would not solicit proxies or become a participant in any election contest.[31] Nickels' and Andersons' reactions to Battle's comments can be characterized only as shock. Nickels called Battle's proposal an "ultimatum." Tr., p. 84. Anderson testified: ". . . we were amazed that they would put us in a corner like that with such little time to act . . . it was certainly contrary to the spirit of all the previous meetings . . . we couldn't understand it . . . it is unbelievable to us that there are people like this who can sit around and say certain things and then turn around and do what they did."[32] No agreement was reached at this

meeting but another was scheduled for Sunday, April 4, 1982.

On April 3, 1982 Norcen's Executive Committee set a tender offer price of $40.00 per share and authorized continued negotiations with Hanna's management.

On April 4, 1982 Battle and G. Montegu Black met with Anderson and Nickels. Battle informed them that Norcen's Executive Committee had set a tender offer price of $40.00 per share. Anderson presented an outline of a "standsill agreement" prepared by Hanna's management which had not, as yet, been approved by Hanna's Board of Directors. Under the proposal Norcen would acquire a twenty (20) percent interest in Hanna by purchasing newly issued common stock and be precluded from further purchases for ten (10) years. Anderson's proposal did not provide for an eighty (80) percent vote of Hanna's Board of Directors for approval of certain major transactions, including the spending of the proceeds received from Norcen's proposed stock purchase.[33] Battle summarily rejected the proposal and informed Anderson and Nickels that, "there is no point in our pursuing these discussions any further and we have no choice but to go with our tender offer on Monday [April 5, 1982] morning." Tr., p. 102. Later that evening, because of a breakdown in negotiations with Hanna's management and upon Lehman Brothers' recommendation, Norcen's Executive Committee increased the tender offer price to $45.00 per share.

On April 5, 1982 Norcen announced that on April 6, 1982 it intended to commence a tender offer for up to 3,800,000 shares of Hanna at a price of $45.00 per share. The 3,800,000 shares represent as of December 31, 1981, approximately 42.7 percent of Hanna's issued and outstanding stock and together with the 783,700 shares Norcen currently owned, would bring its holdings to approximately 51.5 percent. The plaintiffs filed this action within an hour of Norcen's announcement and this court is-

**31.** Plaintiffs' Exhibit 5.

**32.** Deposition of Robert F. Anderson, p. 74.

**33.** Plaintiffs' Exhibit 7.

sued a temporary restraining order the same day.

On April 9, 1982 Norcen filed an amendment to its original Schedule 13D with the SEC. The amendment discloses the pertinent provision of the minutes of Norcen's Executive Committee's meeting of September 9, 1981, identifies the "U.S. Company" as Hanna and provides that "[t]he 'ultimate purpose of acquiring a 51% position at a later date' was intended by E.G. Battle, President and Chief Executive Officer of Norcen, as a corporate goal consistent with Norcen's long range planning to be achieved by Norcen over a period in excess of five years." [34]

Section 13(d)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d)(1), provides that "[a]ny person who, after acquiring directly or indirectly the beneficial ownership of any equity security ... is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors...". The disclosures required in a Schedule 13D statement are contained in sections 13(d)(1)(A)–(E), 15 U.S.C. §§ 78m(d)(1)(A)–(E), which provide as follows:

(A) the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or other-wise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 78c(a)(6) of this title, if the person filing such statement so requests, the name of the bank shall not be made available to the public;

(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the background, identity, residence, and citizenship of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of the profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

The plaintiffs claim that "[t]he Schedule 13D filed by defendants on November 6, 1981 and the amendment filed by defendants on April 9, 1982 fail to state material facts, contain misstatements of material facts, are materially false, misleading, and deceptive, contain material omissions and constitute devices for defrauding Hanna's

---

**34.** Plaintiffs' Exhibit 56, p. 3.

stockholders, potential buyers and sellers of Hanna stock, and Hanna in order to induce them to make uninformed investment decisions with regard to Hanna stock and to take or fail to take other actions, all to enable Norcen to obtain control of Hanna at an artificially low and grossly inadequate price." [35] Specifically, the plaintiffs' amended complaint alleges that:

> The Schedule 13D, contrary to fact, stated that the purchases of Hanna stock to which it related were solely "for investment." In fact, Norcen fully intended those purchases as the first step to enable it to obtain control of, or to exercise management influence over, Hanna pursuant to an actual or threatened tender offer or other transaction.

Amended Complaint, p. 16, ¶ 42. The plaintiffs claim that the April 9, 1982 amendment to the Schedule 13D is "materially false and misleading" in the following particulars:

> (a) While disclosing for the first time the minutes of the September 9, 1981 meeting of Norcen's Executive Committee, which confirm defendants' intent to acquire control of Hanna, defendants falsely state that their plan to acquire control of Hanna was to have taken place over a period of more than five years;
>
> (b) Defendants did not disclose that during meetings in late 1981 and early 1982 with representatives of Hanna, defendants repeatedly and falsely stated that they had purchased stock of Hanna for an investment only and that they did not intend to acquire control of Hanna;
>
> (c) Defendants did not disclose material facts concerning their ongoing efforts to make a tender offer for Hanna stock, including, *inter alia*, the fact that they had drafted tender offer documents by not later than January 8, 1982 and their disclosure of a forthcoming tender offer to a stockholder of Hanna;

> (d) Defendants did not disclose that they had filed and disseminated to the public materially false and misleading statements concerning their efforts to obtain control of Hanna; and
>
> (e) Defendants did not disclose that they had intentionally manipulated the market for Hanna stock and that the price for such stock was artificially low as a result of such manipulation.

*Id.*, pp. 12, 13, ¶ 32. In response to the plaintiffs' claims, the defendants contend that "[w]hatever the merits of [the plaintiffs'] allegation[s]—and [they are] meritless—plaintiffs have no standing to raise any such claims in this Court." [36] (footnote omitted). The thrust of the defendants' contention is that "[r]ecent decisions by the United States Supreme Court and by district courts ... compel the conclusion that there is no private right of action under section 13(d) generally and, more specifically, that there is no private right of action in favor of a target company." [37]

Since it is unquestioned that section 13(d) does not provide for a private right of action, any such right must be judicially implied. Therefore, the initial question presented is whether the plaintiffs have standing to bring this action. Although neither the United States Supreme Court nor the Sixth Circuit Court of Appeals have ruled on this issue, most courts which have, ruled that there is an implied private right of action under section 13(d).

In *General Aircraft Corp. v. Lampert*, 556 F.2d 90 (1st Cir.1977), the First Circuit Court of Appeals held that when a Schedule 13D is incomplete, inaccurate or false the target corporation has standing to maintain a private right of action for injunctive relief "until the Schedule 13D is amended to reflect accurately their [the officers'] intentions." 556 F.2d at 97.

In *GAF Corp. v. Milstein*, 453 F.2d 709 (2d Cir.1971), *cert. denied*, 406 U.S. 910, 92

**35.** Amended Complaint, pp. 15, 16, ¶ 41.

**36.** Defendants' Post-Hearing Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, p. 60.

**37.** *Id.*

S.Ct. 1610, 31 L.Ed.2d 821 (1972), the Second Circuit Court of Appeals held "that the obligation to file *truthful* statements is implicit in the obligation to file with the issuer, [i.e., target corporation] and, *a fortiori*, the issuer has standing under section 13(d) to seek relief in the event of a false filing." 453 F.2d at 720. (footnote omitted), (emphasis in original). Recently, the Second Circuit Court of Appeals reaffirmed its holding in *Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357 (2d Cir.1980). *Accord: Kaufman & Broad, Inc. v. Belzberg*, 522 F.Supp. 35 (S.D.N.Y.1981); *Standard Metals Corp. v. Tomlin*, 503 F.Supp. 586 (S.D.N.Y.1980).

Although the Third Circuit Court of Appeals has not ruled on this issue, in *Crane Co. v. Harsco Corp.*, 511 F.Supp. 294 (D.Del.1981), the District Court of Delaware held "that § 13(e)(1) of the Williams Act, in which timing is a critical element of the regulatory scheme, implies a private right of action for injunctive relief; therefore, [the target corporation] has standing to bring this action." 511 F.Supp. at 301.

In *Dan River, Inc. v. Unitex Limited*, 624 F.2d 1216 (4th Cir.1980), *cert. denied*, 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981), the Fourth Circuit Court of Appeals held "that Dan River [the target corporation] has a right to seek equitable relief enjoining the defendants, and should Dan River establish that there is a reasonable basis for concluding that the Schedule 13D filed by the defendants is inaccurate, incomplete, or misleading in its statement of any of the matters expressly demanded by section 13(d), the district court may and should grant appropriate injunctive relief and should require the filing of an amended Schedule 13D complying with the requirement of a truthful and complete statement as contemplated under the statute." 624 F.2d at 1224.

Although the Fifth Circuit Court of Appeals has not ruled on this issue, in *Saunders Leasing System, Inc. v. Societe Holding Gray D'Albion S.A.*, 507 F.Supp. 627 (N.D.Ala.1981), the District Court for the Northern District of Alabama held that

"... it is clear that Saunders [the target corporation] has standing to challenge violations of section 13(d)." 507 F.Supp. at 633. *Contra: First Alabama Banchares, Inc. v. Lowder*, [1981 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 98,015 (N.D.Ala.1981).

In *Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240 (8th Cir. 1979), the Eighth Circuit Court of Appeals upheld the target corporation's right to maintain an action for injunctive relief requiring the purchaser to file an accurate, truthful and complete Schedule 13D and to make "full and fair disclosure." 611 F.2d at 248, n. 16. *Accord: W.A. Krueger Co. v. Kirkpatrick, Pettis, Smith, Polian, Inc.*, 466 F.Supp. 800 (D.Neb.1979).

In this circuit, district courts have rendered decisions on this issue which differ. *Compare: SZRL Investments v. U.S. Realty Investments*, C81–327 (N.D.Ohio 1981); *Leff v. CIP Corp.* 540 F.Supp. 857 (S.D.Ohio 1981), holding that there is no private right of action under section 13(d) and *Kirsch Co. v. Bliss & Laughlin Industries, Inc.*, 495 F.Supp. 488 (W.D.Mich. 1980), holding that "there is no doubt, that [the target corporation] has standing to contest violations § 13(d)." 495 F.Supp. at 492.

The leading decision precluding an implied private right of action for injunctive relief under section 13(d) is *Gateway Industries, Inc. v. Agency Rent A Car, Inc.*, 495 F.Supp. 92 (N.D.Ill.1980). In *Gateway*, the District Court for the Northern District of Illinois reasoned that courts which have implied a private right of action under section 13(d) "based their finding[s] ... on the authority of *J.L. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964)," (in which the United States Supreme Court held that a private right of action for deceptive proxy solicitations was implied under section 14(a) of the Securities Exchange Act of 1934) and that "[r]ecent Supreme Court decisions, (i.e., *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82

(1979)), "have abandoned the *Borak* approach." 495 F.Supp. at 96. *Accord: Sta-Rite Industries, Inc. v. Nortek, Inc.,* 494 F.Supp. 358, 360 (E.D.Wis.1980), which, citing *Gateway, Transamerica, Touche Ross* and *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), held that there is no implied private right of action under section 13(d) because "[t]hese cases clearly mark a trend toward narrowing the *Borak* standard implying private causes of action under the Securities Exchange Act."

In *Transamerica Mortgage Advisors, Inc. v. Lewis, supra,* the United States Supreme Court held that an implied private right of action for injunctive relief existed under section 215 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–15, but that section 206 of the same Act, 15 U.S.C. § 80b–6, did not create a private right of action for *damages.* In reaching its decision the Court relied solely on the legislative intent underlying the Act as expressed by the statutory language and the legislative history. Similarly, in *Touche Ross & Co. v. Redington, supra,* the Court held that there is no implied private right of action for *damages* under section 17(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78q(a). Once again, the Court found no evidence of congressional intent to create a private right of action for damages. This court is not persuaded by the manner in which *Gateway* applied the holdings of *Transamerica* and *Touche Ross* to a private right of action for injunctive relief under section 13(d) because: (1) those holdings involved implied rights of action for damages rather than injunctive relief; and (2) the statutes at issue did not involve any public interest which required full and truthful disclosure. *Accord: Kirsch Co. v. Bliss & Laughlin Industries, Inc., supra,* 495 F.Supp. at 490, 491; *Kaufman & Broad, Inc. v. Belzberg, supra,* 522 F.Supp. at 41, "[t]he Supreme Court apparently has not understood its decisions as overruling [*GAF Corp. v. Milstein, supra,*] as the Court has recently denied a petition for certiorari in *Unitex Limited v. Dan River, Inc.,* 449 U.S. 1101, 101 S.Ct.

896, 66 L.Ed.2d 827 (1981), letting stand a decision of the Fourth Circuit following *GAF,* 624 F.2d 1216 (1980)"; *Crane Co. v. Harsco Corp., supra,* 511 F.Supp. at 301.

In *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977), the United States Supreme Court held "that the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer." In *Piper,* the Court reaffirmed its holding in *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 2076, 45 L.Ed.2d 12 (1975), that "[t]he purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party." (footnote omitted). The legislative history of section 13(d) provides that "[t]he purpose of § 13(d) is to require disclosure of information by persons who have acquired a substantial interest or increased their interest in equity securities of a company by a substantial amount, within a relatively short period of time." S.Rep. No. 550 at 7; H.R.Rep. No. 1711 at 8, 90th Cong., 2d Sess. (1968) U.S.Code Cong. & Ad.News, pp. 2811, 2818. *See also: Saunders Leasing System, Inc. v. Societe Holding Gray D'Albion S.A., supra,* 507 F.Supp. at 632; *Kirsch Co. v. Bliss & Laughlin Industries, Inc., supra,* 495 F.Supp. at 491. As noted in *Crane Co. v. Harsco Corp., supra,* 511 F.Supp. at 300, although "[t]he Williams Act contains no express remedy to facilitate this purpose; the purpose suggests ... that an implied private right of action [under section 13(d)] was intended."

■ In *Piper v. Chris-Craft Industries, Inc., supra,* the United States Supreme Court refused to hold that a defeated tender offeror could maintain a private right of action for damages against the successful bidder and the target corporation under section 14(e) of the Williams Act, 15 U.S.C. § 78n(e). The Court held that "... judicially creating a damages action ... is unnecessary to ensure the fulfill-

ment of Congress' purpose in adopting the Williams Act." 430 U.S. at 41, 97 S.Ct. at 949. The Court, however, specified the narrow scope of its holding:

> Our holding is a limited one. Whether shareholder-offerees, the class protected by § 14(e), have an implied cause of action under § 14(e) is not before us, and we intimate no view on the matter. Nor is the target corporation's standing to sue in issue in this case. We hold only that a tender offeror, suing in its capacity as a takeover bidder, does not have standing to sue for damages under § 14(e).

*Id.* at 42, n. 28, 97 S.Ct. at 949, n. 28. Moreover, the Court expressly reserved the question of whether there is an implied private right of action for injunctive relief under the Williams Act:

> We intimate no view upon whether as a general proposition a suit in equity for injunctive relief, as distinguished from an action for damages, would lie in favor of a tender offeror under § 14(e) or Rule 10b–6.

*Id.* at 47, n. 33, 97 S.Ct. at 952, n. 33.[38] *Piper* suggests that the nature of the relief requested affects the determination of whether a statute creates a private right of action. *See: Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366 (6th Cir.1981); *Crane v. Harsco Corp., supra.* Indeed, in *Piper,* the Court noted that "... in corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits, 'is the time when relief can best be given.'" *Id.* 430 U.S. at 42, 97 S.Ct. at 949, *quoting Electronic Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 942 (2d Cir.1969). Premised on this analysis and that which

follows regarding the legislative intent underlying section 13(d), this court holds that a target corporation has standing to maintain a private right of action for injunctive relief under the statute. To the extent that there are decisions which differ this court declines to follow them.

Before concluding that Congress intended to imply a private right of action for injunctive relief under section 13(d), this court must analyze the four factors which the United States Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), identified as indicative of such an intent. *See also: Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). First, the court must decide if the plaintiff is "one of the class for whose *especial* benefit the statute was enacted..." *Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. at 2088 (citation omitted). (emphasis in original). Although Hanna is not an intended beneficiary of the disclosure provided by section 13(d),[39] it, as the target corporation, is the only party that possessed knowledge of Norcen's alleged misrepresentations and thus, sustains the practical opportunity to protect shareholders, who are the intended beneficiaries of such disclosure. Accordingly, the court holds that Hanna, as the target corporation, has standing to represent those "for whose *especial* benefit" section 13(d) was enacted and therefore, satisfies the first factor mandated by the standard promulgated in *Cort v. Ash, supra. Cf: Crane Co. v. Harsco Corp., supra,* which, for similar reasons held that a tender offeror has standing to maintain a private right of action for injunctive relief under the Williams Act.

---

**38.** The question raised was recently resolved in the affirmative by the Sixth Circuit Court of Appeals in *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366 (6th Cir.1981).

**39.** *See: Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 59, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975) in which the United States Supreme Court held that:

> ... Congress expressly disclaimed an intention to provide a weapon for management to

discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts. Indeed, the Act's draftsmen commented upon the "extreme care" which was taken "to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid."

(citations omitted).

The second *Cort* factor is whether there was "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one." *Cort v. Ash, supra*, 422 U.S. at 78, 95 S.Ct. at 2088. Although the legislative history of section 13(d) contains no explicit indication of an intent to create or deny a private right of action for injunctive relief, the investor protection purpose of the Williams Act compels the conclusion that such an action is implicit in the statutory scheme for two reasons. First, an action for injunctive relief furthers the purpose of section 13(d) by assuring that shareholders will have full and adequate information to make their decisions as to whether to tender their stock to a tender offeror and second, "[t]his type of action serves ... to prevent the manipulative practices at which the Williams Act was aimed without deterring management [of the target corporation] or competing offerors from engaging in the battle." *Mobil Corp. v. Marathon Oil Co., supra*, 669 F.2d at 372.

The third *Cort* factor requires the court to ascertain whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff." *Cort v. Ash, supra*, 422 U.S. at 78, 95 S.Ct. at 2088. Premised on the preceding reasoning regarding the first two factors of the *Cort* standard, resolution of the third factor is obvious. A private right of action for injunctive relief under section 13(d) insures that neither the tender offer-

or nor the target corporation will engage in manipulative or fraudulent conduct to the disadvantage of shareholders. Moreover, such an action will not prove valuable as a tactic for delay given the stringency and urgency of the standard for a preliminary injunction. *See: Crane Co. v. Harsco Corp., supra.*

The fourth *Cort* factor requires the court to determine whether the "cause of action [is] one traditionally relegated to state law...." *Cort v. Ash, supra*, 422 U.S. at 78, 95 S.Ct. at 2088. This court is aware of no Ohio law providing a right of action for disclosure required under the federal securities laws. Thus, an implied private right of action for injunctive relief under section 13(d) will not interfere with any Ohio corporate law.

Accordingly, this court holds that a target corporation has standing to maintain private right of action under section 13(d) of the Securities Exchange Act of 1934 pursuant to the standard promulgated by the United States Supreme Court in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Since it is unquestioned that private rights of action for injunctive relief exist under section 14(e), 15 U.S.C. § 78n(e),[40] *Mobil Corp. v. Marathon Oil Co., supra; Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc.*, 476 F.2d 687 (2d Cir.1973), section 10(b), 15 U.S.C. § 78j(b)[41] and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.-

---

**40.** 15 U.S.C. § 78n(e) provides as follows:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

**41.** 15 U.S.C. § 78j(b) provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

... To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

10b–5,[42] *James v. Gerber Products Co.*, 587 F.2d 324, 326 (6th Cir.1978); *Fridrich v. Bradford*, 542 F.2d 307, 314 (6th Cir.1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 769 (1977); *Kardon v. National Gypsum Co.*, 69 F.Supp. 512 (E.D.Pa. 1946),[43] of the Securities Exchange Act of 1934, the next question presented is whether the plaintiffs are entitled to the preliminary injunction they seek.

The Sixth Circuit Court of Appeals has repeatedly held that a district court must evaluate the following four factors in determining whether to issue a preliminary injunction: "(1) whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits; (2) whether the plaintiffs have shown irreparable injury; (3) whether the issuance of a preliminary injunction would cause substantial harm to others;" and "(4) whether the public interest would be served by issuing a preliminary injunction." *Mason County Medical Ass'n. v. Knebel*, 563 F.2d 256, 261 (6th Cir.1977); *Mobil Corp. v. Marathon Oil Co., supra*, 669 F.2d at 369; *Adams v. Federal Express Corp.*, 547 F.2d 319 (6th Cir.1976), *cert. denied*, 431 U.S. 915, 97 S.Ct. 2177, 53 L.Ed.2d 225 (1977).

■ The defendants contend that the plaintiffs are not entitled to a preliminary injunction on their section 13(d) claims because they have not shown a substantial probability of success on the merits and cannot demonstrate that they will suffer irreparable injury in the absence of a preliminary injunction. With regard to substantial probability of success on the merits the thrust of the defendants' contention is as follows:

Plaintiffs' case rests on the allegation that defendants had formed a firm and unqualified intent to acquire control of Hanna as early as September, 1981 and that defendants did not disclose that intent until Norcen announced its tender offer on April 5, 1982. The evidence has shown that allegation to be false. *The evidence has shown that the firm and unqualified intent charged by plaintiffs did not in fact exist until the eve of Norcen's tender offer.*

Defendants' Post-Hearing Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, pp. 64, 65. (footnote omitted). (emphasis added). The defendants claim that since "[t]he evidence has shown that throughout the period November, 1981 to April, 1982, numerous ['fluid'] alternatives regarding Norcen's investment in Hanna were considered by various members of Norcen's management and Board of Directors," the emphasized assertion in their brief concerning the formulation of takeover intent on the "eve of Norcen's tender offer" is supported by the record. The defendants' construction of the record is strained and unpersuasive. The evidence in this case establishes that: (1) Conrad Black expressed his interest in investing in Hanna to a large Hanna shareholder as early as January, 1979; (2) that such discussions with other Hanna shareholders who owned large blocks of stock continued in 1980 and 1981; (3) that Norcen's Executive Committee approved a program for acquisition of a fifty-one (51) percent interest in Hanna on September 9, 1981; (4) that within twenty (20) days of the date Norcen filed its Schedule 13D with the SEC Nor-

---

**42.** 17 C.F.R. § 240.10b–5 provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**43.** *See generally: Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 1376, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

cen's United States counsel prepared two memorandums and a timetable for a tender offer to gain control of Hanna; (5) that despite the Executive Committee's authorization and the legal preparations, Norcen issued a press release dated November 6, 1981 stating that it had acquired an 8.8 percent interest in Hanna for "investment" and repeated that statement of intent in its Schedule 13D filed on November 9, 1981; (6) that the statement of "investment" intent was repeated again in Norcen's annual report to shareholders on February 16, 1982 and in Norcen's Form 10K filed with the SEC on March 31, 1982,. (five (5) days before Norcen's tender offer was announced); and (7) that by the time the Form 10K was filed, Norcen had engaged an investment banking firm (Lehman Brothers) and arranged to finance its acquisition of a controlling interest in Hanna with the Canadian Imperial Bank of Commerce. Contrary to the defendants' contention that Norcen's intent to make a tender offer for Hanna was formulated on the eve of the tender offer, this court finds that the evidence *establishes conclusively* that Norcen contemplated such an action as early as the date on which it filed its Schedule 13D if not earlier. The court follows the holding of *Riggs National Bank of Washington, D.C. v. Allbritton*, 516 F.Supp. 164, 175 (D.D.C.1981), which is instructive on this point:

> The Court rejects the defendant's position that the intent to make a tender offer, and thus to acquire control of the Bank, was formulated not earlier than the day before the Offer was announced. The Court may accept that the final decision was not made until February 8 but *final decision and intent in this connection are surely distinguishable.* The totality of the evidence before the Court substantiates the plaintiff's contention that defendant has long contemplated control of Riggs Bank. While the Court need not find the precise date the intent was formed, the evidence strongly suggests that it was at least contempora-

neous with the contemplation and negotiation of the Carnicero Purchase. The plaintiff has demonstrated its likelihood of succeeding on this claim.

(emphasis added). Moreover, the court finds further that the evidence raises "serious questions going to the merits," *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568 (2d Cir.1981), *quoting Hamilton Watch Co. v. Benrus Watch Co., Inc.*, 206 F.2d 738, 740 (2d Cir.1953), with regard to the truthfulness of the disclosure contained in Norcen's amendment to its original Schedule 13D explaining the minutes of Norcen's September 9, 1981 Executive Committee meeting.[44] Accordingly, the court holds that the plaintiffs have shown a substantial probability of success on the merits of their claims that the defendants have engaged in conduct which is violative of section 13(d).

The defendants' second contention is that the plaintiffs cannot demonstrate that they will suffer irreparable injury in the absence of a preliminary injunction. Its thrust is that the "[p]laintiffs ... cannot establish the requisite irreparable injury for the simple reason that, assuming *arguendo* that Norcen's original Schedule 13D materially misrepresented the company's purpose in acquiring its Hanna shares, that defect was cured on April 5, 1982, when Norcen issued a press release containing a public announcement of its intent to make a tender offer for Hanna, and on April 9, 1982, when Norcen filed an amendment to its Schedule 13D disclosing an intent to obtain control of Hanna." Defendants Post-Hearing Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, p. 37. According to the defendants, "[t]hose two curative public documents eliminated the possibility of irreparable harm and made any further relief in this case both unnecessary and unappropriate." *Id.*

It is unquestioned that in some cases in which violations of section 13(d) have been found, corrective disclosure has been held a sufficient remedy. *See: Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49,

---

**44.** *See:* p. 1188, *supra.*

95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); *Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357 (2d Cir.1980); *Chromalloy Companies Corp. v. Sun Chemical Corp.*, 611 F.2d 240 (8th Cir.1979); *Raybestos-Manhattan, Inc. v. Hi-Shear Industries, Inc.*, 503 F.Supp. 1122 (S.D.N.Y.1980); *Standard Metals Corp. v. Tomlin*, 503 F.Supp. 586 (S.D.N.Y.1980); *Avnet, Inc. v. Scope Industries*, 499 F.Supp. 1121 (S.D.N.Y. 1980); *Brascan Ltd. v. Edper Equities Ltd.*, 477 F.Supp. 773 (S.D.N.Y.1979). "On the other hand, the requisite irreparable harm has been found where, as here, there are sufficiently pleaded allegations of continuing material nondisclosures." *Kaufman & Broad, Inc. v. Belzberg*, 522 F.Supp. 35, 45 (S.D.N.Y.1981). (emphasis in original). *See also: General Aircraft Corp. v. Lampert*, 556 F.2d 90 (1st Cir. 1977); *W.A. Krueger Co. v. Kirkpatrick, Pettis, Smith, Polian, Inc.*, 466 F.Supp. 800 (D.Neb.1979).[45] In *General Aircraft Corp. v. Lampert, supra*, 556 F.2d at 96, 97 the First Circuit Court of Appeals reasoned:

As the very *raison d'etre* of Section 13(d) was thwarted by appellants' continued failure to disclose the statutorily required information, we discover no error in the decision that irreparable injury would occur to shareholders and the investing public if appellants were allowed to continue their activities without correcting and amplifying their Schedule 13D.

In *General Steel Industries, Inc. v. Walco National Corp.*, [Current Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,402 (E.D.Mo.1981), the District Court for the Eastern District of Missouri found that a Schedule 13D and amendments thereto filed by the defendant, Walco National Corporation, (hereinafter, Walco), were "materially false and misleading" because they fraudulently disclosed that Walco's purchases of the plaintiff, General Steel Industries, Incorporated's, (hereinafter GSI), stock were "for investment," when in fact Walco's true intent was to obtain control of GSI. *General Steel Industries, Inc. v. Walco National Corp., supra*, ¶ 98,402 at p. 92,415. The court found further that "[u]nless an injunction is issued, GSI and its shareholders, *both those who presently own shares and those who sold during Walco's non-compliance with the requirements of Section 13(d) ... will be irreparably harmed in that:*

(i) *Walco's illegally obtained blocking position has placed it in a position to inhibit competing offers and has made it extremely difficult for GSI to arrange for a merger, business combination or to pursue other possible business opportunities which would be favorable to all GSI shareholders* (as opposed to the 19 percent which Walco seeks). *Once Walco controls GSI, it will have little, if any, incentive to pay a premium to the remaining GSI shareholders in a subsequent merger of GSI and Walco. In addition, Walco's acquisition of over 51% of GSI will reduce the liquidity of GSI stock held by the remaining GSI shareholders.*

(ii) *The knowledge that Walco's ultimate purpose was to seek control of GSI may have led many shareholders who sold in the open market to hold onto such shares in anticipation of a higher price or to stay with the new entity. The stockholders that sold could not be compensated for the irretrievable loss of the opportunity to consider whether they wished to sell their*

---

**45.** "The basic test of materiality ... is whether a *reasonable* man would attach importance [to the fact] in determining his choice of action in the transaction in question." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968), *cert. denied sub nom. Coates v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). (emphasis in original). "Materiality encompasses those facts which in reasonable and objective contemplation might affect the value of the corporation's stock or securities ...". *List v. Fashion Park Inc.*, 340 F.2d 457, 462 (2d Cir.), *cert. denied sub nom., List v. Lerner*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). (citation omitted). Since it is clear that the failure to disclose an intent to make a tender offer "might affect the value of [a] corporation's stock or securities," no further discussion of materiality is necessary.

*shares at a time when a takeover was intended or whether they wished to facilitate, directly or indirectly, the acquisition by Walco of GSI.*

(iii) *Shareholders who sold to Walco irretrievably lost their ability to obtain a control premium for their shares—a loss not compensable by a monetary award—and unwittingly sacrificed their right to knowingly determine who should be in a position to control GSI.*

*Id.* at p. 92,418 (emphasis added). Citing *Rondeau v. Mosinee Paper Corp., supra,* the court also found that "... Walco's willful violation of the Williams Act, followed on the heels by the Offer, provides additional basis for the issuance of an injunction." *Id.* Accordingly, the court held as follows:

... Because of the irreparable harm to GSI shareholders, both past and present, it is appropriate that Walco offer recision to all GSI shareholders that sold in the open market during the period of its noncompliance and that the Offer be enjoined pending the completion of that process.... Additionally, an injunction pending recision is appropriate to deter future violations of law and *to prohibit Walco from taking advantage of a position it has illegally obtained.*

*Id.* (citations omitted). (emphasis added).

■ Similar to the irreparable harm found in *GSI,* this court finds that the evidence establishes that: (1) by reason of its 8.8 percent interest, Norcen has a competitive advantage over any other potential offeror for Hanna; (2) once Norcen controlled Hanna, Norcen would have no incentive to pay a premium to the remaining Hanna shareholders in the event of a subsequent merger of the two companies and, therefore, the remaining shareholders would possess an illiquid investment; and (3) the Hanna shareholders who sold shares on the open market during the period Norcen's original Schedule 13D was in effect

irretrievably lost their ability to obtain a control premium, a loss not compensable by a monetary award. When these facts are considered in light of the proposition that continuing material nondisclosures (a claim on which the plaintiffs have established "serious questions going to the merits," *Buffalo Forge Co. v. Ampco-Pittsburgh Corp., supra,* ) also constitutes irreparable injury, the court holds that the plaintiffs have established sufficient irreparable harm for the issuance of a preliminary injunction under section 13(d). Since the issuance of a preliminary injunction under section 13(d) will not cause substantial harm to others and furthers the investor protection purpose of the Williams Act, the plaintiffs' motion for a preliminary injunction enjoining Norcen from carrying out its proposed tender offer for Hanna is granted. Moreover, the court further holds that the plaintiffs' are entitled to preliminary injunctive relief under sections 10(b), 14(e) and Rule 10b–5.

The defendants contend that the plaintiffs have failed to establish a violation of section 10(b) or section 14(e) because: (1) "[p]laintiffs have failed to establish that the alleged nondisclosures by defendants were 'in connection with' a tender offer, as required by section 14(e) of the Exchange Act";[46] (2) "[p]laintiffs have failed to establish that defendants engaged in a manipulative scheme, in violation of section 10(b) or section 14(e) of the Exchange Act";[47] and (3) "[e]ven if plaintiffs have established that defendants engaged in a manipulative scheme, plaintiffs are not entitled to relief [because] ... the proper remedy in such a situation is to eliminate the 'manipulation' ... and then permit the tender offer to proceed 'free of the inhibiting and unlawful impact' of the 'manipulation,' "[48] *quoting Mobil Corp. v. Marathon Oil Co.,* 669 F.2d at 377. Plaintiffs, on the other hand, contend that the defendants have engaged in a series of misrepresentations in anticipation of the tender of-

---

**46.** Defendants' Post-Hearing Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, p. 83.

**47.** *Id.* at 87.

**48.** *Id.* at 97, 98.

fer announced on April 5, 1982 which had the purpose and effect of maintaining the price of Hanna's stock at an artificially low level on the New York Stock Exchange. According to the plaintiffs, these misrepresentations constitute manipulative acts and practices in violation of section 10(b), 14(e) and Rule 10b–5.

■ Although this court has noted that a private right of action for injunctive relief exists under section 10b–5,[49] the court is also aware of some cases which have held that a corporation which is the target of a tender offer does not have standing to maintain such an action because it is not a purchaser or seller of securities.[50] *See e.g., GAF Corp. v. Milstein,* 453 F.2d 709 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); *Avnet, Inc. v. Scope Industries, supra; W.A. Krueger Co. v. Kirkpatrick, Pottis, Smith, Polian, Inc., supra.* In *GAF Corp. v. Milstein, supra,* 453 F.2d at 722, n. 27, however, the Second Circuit Court of Appeals held that a narrow exception to the purchaser or seller standing rule did exist:

We do not foreclose the possibility, for example, that an issuer might have standing under 10b–5 to seek injunctive relief in circumstances where, *despite the absence of a purchase or sale,* it has suffered or will suffer direct injury because of the alleged fraud, or where *it would be the most appropriate party to assert 10b–5 violations affecting all of its shareholders. The issuer, for example, may have standing to enjoin a manipulative scheme which had the effect of depressing the price of the issuer's stock* immediately prior to a contemplated issue of securities, or it may have standing to enjoin a fraud whose purpose was to inflate the market value of the stock of a company with which the issuer was negotiating a merger. Moreover, there may be additional situations in which the standing of the issuer under 10b–5 will have to be appraised anew. (emphasis added). This reasoning is quite similar to that which supports implying a private right of action for injunctive relief under section 13(d) pursuant to the first factor of the standard promulgated by the United States Supreme Court in *Cort v. Ash, supra.*[51] This court finds such reasoning persuasive and, therefore, holds that Hanna, as the target corporation, has standing to maintain a private right of action for injunctive relief under section 10(b) and Rule 10b–5.

Since the provisions of section 10(b), Rule 10b–5 and section 14(e) are "coextensive in their antifraud prohibitions, and differ only in their 'in connection with' language," *Panter v. Marshall Field & Co.,* 646 F.2d 271, 282 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981), "[t]hey are ... construed in *pari materia* by courts." *Id.* See also: *Applied Digital Data Systems Inc. v. Milgo Electronic Corp.,* 425 F.Supp. 1145 (S.D.N.Y.1977).

The thrust of the defendants' first contention is as follows:

To the extent that plaintiffs are postulating claims under Section 14(e) of the Exchange Act based upon an alleged failure to disclose a material fact or upon an alleged market manipulation, those claims must fail because none of the Norcen actions complained of by plaintiffs was 'in connection with a tender offer.' Even assuming that Norcen had intent to control Hanna as early as September, 1981, neither the stock purchases which necessitated Norcen's November 9, 1981 Schedule 13D nor the actual filing of either the Schedule 13D itself or the 1981 Norcen Annual Report or Form 10K were 'in connection with a tender offer.' Absent that factor, there can be no cognizable claim under Section 14(e). Defendants' Post-Hearing Memorandum in Opposition to Plaintiffs' Motion for Prelimi-

49. *See:* p. 1193, *supra.*

50. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1952); *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

51. *See:* p. 1192 *supra.*

nary Injunction, pp. 83, 84. In *Lewis v. McGraw*, 619 F.2d 192 (2d Cir.), *cert. denied*, 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980), the Second Circuit Court of Appeals held that when a proposed tender offer never becomes effective, shareholders of the target corporation cannot maintain a cause of action for alleged misstatements under section 14(e) because of the absence of the critical element of reliance. In *Lewis*, the American Express Company, (hereinafter AMEXCO), proposed a "friendly business combination" with McGraw-Hill, Incorporated, (hereinafter McGraw-Hill). McGraw-Hill directors rejected the proposal, characterizing it as "reckless," "illegal," and "improper." *Lewis v. McGraw, supra*, 619 F.2d at 194. AMEXCO withdrew its proposed offer and in its place substituted a new proposal which "would not become effective unless McGraw-Hill's incumbent management agreed not to oppose it by 'propaganda, lobbying, or litigation.' " *Id.* This proposal was also rejected by McGraw-Hill's directors and thus, no tender offer by AMEXCO ever became effective. In affirming the district court's dismissal for failure to state a claim upon which relief can be granted, the Second Circuit Court of Appeals held that "[i]n the instant case, the target's shareholders simply could not have relied upon McGraw-Hill's statements, whether true or false, since they were never given an opportunity to tender their shares." *Id.* at 195. *Accord: Panter v. Marshall Field & Co., supra.* Rather than promulgate an absolute rule, however, the Second Circuit Court of Appeals limited its holding in *Lewis* to its particular facts:

> We note in closing that our holding today does not place statements made on the eve of a tender offer by target or tendering companies wholly outside the scope of the Williams Act. On the contrary, where the offer ultimately becomes effective, and reliance can be demonstrated or presumed, such statements may well be made "in connection with a tender offer" as required by § 14(e).

Otherwise, either party would be free to disseminate misinformation up to the effective date of the tender offer, thus defeating in substantial part the very purpose of the Act—informed decision-making by shareholders. *Injunctive relief, moreover, may be available to restrain or correct misleading statements made during the period preceding a tender offer where it appears that such an offer is likely, and that reliance upon the statements at issue is probable under the circumstances.*

(citation omitted). (emphasis added). *Accord: Canadian Pacific Enterprises (U.S.) Inc. v. Krouse*, 506 F.Supp. 1192, 1198 (S.D.Ohio 1981). In *Berman v. Gerber Products Co.*, 454 F.Supp. 1310, 1318 (W.D.Mich.1978), the court held:

> It is well settled that statements made by either the offeror or the target company prior to the actual effective date of a tender offer *but after the announcement of the offer and preliminary filings* fall within the purview of § 14(e).... During this interim period the policies behind § 14(e) apply with as much force as they do following the effective date of the offer.

(citations omitted). (emphasis added). Similarly, in *Applied Digital Data Systems Inc. v. Milgo Electronic Corp., supra*, 425 F.Supp. at 1152, the court held:

> In practical terms, the situation is no different *when the offer has been announced but not formally made.* Thus, when ADDS made a public announcement of its forthcoming *offer*, it had a legally cognizable interest in Milgo and in the actions taken by the Milgo Board of Directors in response to the announcement.

(footnote omitted). (emphasis added). The defendants argue that "[n]either of the above cases [*Berman v. Gerber Products Co., supra; Applied Digital Data Systems Inc. v. Milgo Electronic Corp., supra,*] ... permit the suit brought [in this court] because none of the defendants' statements

was [sic] made after public announcement of Norcen's tender offer." [52] The defendants' argument is unpersuasive for two reasons. First, the court has found that the evidence "raises serious questions going to the merits," *Buffalo Forge Co. v. Ampco-Pittsburgh Corp., supra,* with regard to the truthfulness of the disclosure contained in Norcen's amendment to its original Schedule 13D, a statement made *after* the announcement of the tender offer; [53] and second, assuming the accuracy of the defendants' contention that 'none of their statements were made after public announcement of Norcen's tender offer,' the court finds their construction of section 14(e) to be overly restrictive.

■ In *Applied Digital Data Systems Inc. v. Milgo Electronic Corp., supra,* 425 F.Supp. at 1153, the court reasoned that "[a] proper evaluation of whether a claim is stated under a provision of the securities laws cannot ... be based solely upon the bare language of the statute at issue but must take into consideration both the meaning of the language within the particular context in which it occurs and the propensity of a given construction of the provision to effectuate the remedial purposes of the securities acts." (footnote omitted). Although the court was confronted with the question of whether a plaintiff could maintain an action under section 14(e) premised on statements made *after* public announcement but *before* formal commencement of a tender offer, the court's reasoning, in rejecting the defendant's contention that the plaintiff failed to state a claim upon which relief can be granted because the tender offer had not formally commenced, is equally applicable to the present case:

Defendants' overly strict and literal reading of the statute, which would confine the disclosure and fair-play provisions of the Act to the period after an offer has been formally made, would ob-

viously frustrate the express remedial purposes of the statute. Indeed, it would be anomalous were sections 14(d) and 14(e) not applicable to the offeror or target corporation once a public announcement of an imminent tender or exchange offer was made, for numerous misstatements, omissions and half-truths could be promulgated with relative impunity until the offer was actually filed with and approved by the SEC. *Although the shareholders might not in the pre-offer period be faced with a present decision whether to exchange their stock in the target corporation, statements and actions of the target corporation and the offeror during this period clearly have the capacity to affect any future decision and should thus fall within the purview of the statute. This is especially so when, as here, the competing parties by their acts and conduct clearly indicate that in fact they deem the proposal of an exchange offer to be genuine.*

*Applied Digital Data Systems Inc. v. Milgo Electronic Corp., supra,* 425 F.Supp. at 1154. (footnote omitted). (emphasis added). Premised on this reasoning and that of the Second Circuit Court of Appeals in *Lewis v. McGraw, supra,* this court holds that the plaintiffs are entitled to injunctive relief under section 14(e) as a remedy for misleading statements made by the defendants during the period preceding the announcement of Norcen's tender offer for Hanna because such an offer was contemplated long before it was actually announced and reliance on the statements in issue was probable under the circumstances.

■ The thrust of the defendants' second contention is that "simple nondisclosure" does not constitute "manipulation" in violation of sections 10(b) and 14(e) and "... that only actions *in the market* which directly and artificially affect stock prices

---

**52.** Defendants' Post-Hearing Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, p. 86.

**53.** *See:* pp. 1192–1194, *supra.*

can properly be deemed 'manipulative.' "[54] (emphasis in original). *See: In re Commonwealth Oil/Tesoro Petroleum Securities Litigation,* 484 F.Supp. 253 (W.D.Tex. 1979); *Hundahl v. United Benefit Life Insurance Co.,* 465 F.Supp. 1349 (N.D.Tex. 1979). For the reasons which follow the court holds the defendants' claim to be without merit.

Although the term "manipulative" is not defined in either the Securities Exchange Act of 1934 or the Williams Act, the United States Supreme Court has reasoned that:

> Use of the word "manipulative" is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976). (footnote omitted). The Court reemphasized and elaborated on this reasoning in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977):

> "Manipulation" is "virtually a term of art when used in connection with securities markets." *Ernst & Ernst,* 425 U.S., at 199 [96 S.Ct. at 1384]. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.

In interpreting these decisions in *Mobil Corp. v. Marathon Oil Co., supra,* 669 F.2d at 374, the Sixth Circuit Court of Appeals noted that " '[m]anipulation' in securities markets can take many forms ... but the Supreme Court has recently indicated that manipulation is an affecting of the market for, or price of, securities by *artificial* means, i.e., means unrelated to the natural forces of supply and demand." (emphasis in original).

In *Mobil Corp. v. Marathon Oil Co., supra,* the Sixth Circuit Court of Appeals took a more flexible approach to what constitutes market manipulation than that argued by the defendants. In *Mobil,* the court held that manipulation may occur even with full disclosure of the manipulative act or device and without any trading activity in the market if the price of stock has been effected by means unrelated to normal market forces. In *Mobil,* the target corporation of a hostile tender offer gave options to a competing offeror to purchase certain assets and stock of the target corporation in order to induce a competing tender offer. All of the terms of the option agreements were fully disclosed. The court held the options to be manipulative and in violation of section 14(e) because they placed an artificial ceiling on the value of the target corporation's stock and "prevented all others from competing on par" for control of the target corporation. *Id.* at 376.

Here, the evidence establishes that Norcen's representation of an investment intent in the acquisition of its 8.8 percent interest in Hanna had an effect on the price of Hanna stock which the defendants' expert conceded was trading on March 31, 1982 at a price lower than it would have been had Norcen disclosed its intent to acquire control. Norcen was protected against competition for Hanna by its continued misrepresentation of the purpose of its October 28, 1981 purchase of 580,000 shares and its intention to acquire control. The effect Norcen's misrepresentations had on the price for Hanna stock also made it appear that the tender offer price of $45.00 per share, which Norcen announced on April 5, 1982, was a substantial premium of what the evidence establishes was a market price effected by "means unrelated to the natural forces of supply or demand." *Id.* at 374. The evidence thus supports the plaintiffs' contention that Norcen's repeated misrepresentations of its intention

---

**54.** Defendants' Post-Hearing Memorandum in Opposition to Plaintiffs' Motion for Preliminary

Injunction, p. 87.

to acquire control of Hanna and the purchase of 580,000 shares of Hanna stock on October 28, 1981 were manipulative violations of section 10(b), Rule 10b–5 and section 14(e).

■ The defendants' third and final contention is that even if they engaged in a manipulative scheme, the proper remedy is to eliminate the manipulation by ordering corrective disclosure and then permit the tender offer to proceed. Although the remedy urged by the defendants may be proper in some circumstances, it is utterly without merit in this case.

In *General Steel Industries, Inc. v. Walco National Corp., supra,* the district court held that corrective disclosure would not be sufficient to remedy the irreparable harm to GSI's shareholders caused by Walco's false filings with the SEC because Walco, as a result of its stock purchase, was in a position to inhibit competing tender offers, merger proposals or any other business combinations for GSI. Therefore, the court enjoined Walco's tender offer pending rescission of all of the stock purchases made after May 1, 1982, (the date Walco filed its false Schedule 13D), and divestiture of any of those shares still held after completion of the rescission offer. Walco appealed the district court's decision to the Eighth Circuit Court of Appeals arguing that the district court had no authority to enjoin the tender offer and order rescission or divestiture after Walco had disclosed its true intent with regard to its purchase of GSI stock.[55] While the appeal was pending, the SEC filed a brief *amicus curiae,* in which it stated its position regarding the remedy ordered by the district court. The thrust of the SEC's position was released in SEC Litigation Release No. 9533, *reprinted in,* [Current Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,387 (Dec. 21, 1981) and provides as follows:

> The Commission urged in its brief that the district court's equitable jurisdiction to remedy Section 13(d) violations includes the authority to order

> *any relief appropriate under the circumstances. The Commission expressed the view that equitable remedies in addition to corrective disclosure, such as rescission and divestiture, may be necessary or appropriate to remedy violations of the Williams Act, particularly in cases where the defendant deliberately violated Section 13(d) and the illegal conduct had permitted the defendant to obtain a sufficient number of shares to inhibit competing tender offers or merger proposals. In such cases, absent rescission or divestiture or other remedy removing the wrongfully obtained blocking position, shareholders could be irreparably harmed and the defendant would be permitted to benefit from its wrongful conduct.*

SEC Litigation Release No. 9533, *supra,* ¶ 98,387 at p. 92,344. (emphasis added). *See also: Electronic Speciality Co. v. International Controls Corp., supra,* in which the Second Circuit Court of Appeals held that divestiture is "well within the bounds of [the district court's] discretion. 409 F.2d at 947.

Although formulation of an appropriate remedy must await final hearing on a permanent injunction, the evidence presented by the plaintiffs on their motion for a preliminary injunction supports the remedy of divestiture that they request. The evidence establishes that by reason of the large block of stock acquired by Norcen on October 28, 1981, Norcen has an advantage over any other potential offeror for Hanna. *General Steel Industries v. Walco National Corp., supra,* holds that more than corrective disclosure is necessary in such circumstances. Indeed, if, as in this case, the evidence indicates a continuing fraud, divestiture of the stock acquired in the transaction which gave rise to the statutory duty violated in a false Schedule 13D filing seems as appropriate a remedy as the divestiture ordered in *General Steel Industries,* of the stock purchased after the false

---

**55.** The case was settled before the Eighth Circuit Court of Appeals rendered a decision.

Schedule 13D was filed. Any different result would mean that an acquiring corporation could engage in the most deliberate form of misrepresentation in its statutory filings and when its fraud is discovered merely file corrective amendments and keep the benefits of its wrongful conduct regardless of how that conduct may continue to injure shareholders of the corporation whose stock it has acquired.

Accordingly, the plaintiffs' motion for a preliminary injunction restraining the defendants from carrying out their proposed tender is granted under sections 13(d), 10(b), 14(e) and Rule 10b–5 of the Securities Exchange Act of 1934.

IT IS SO ORDERED.